# SUSAN R. DICKINSON, RN

November 14, 2006

Carmen L. Durso, Esq.
Law Office of Carmen Durso
175 Federal St.
Suite 1425
Boston, Mass. 02110

Dear Mr. Durso:

This is a report addressing my review of the standard of care of Nurse Candace Kalombratsos at Gambro Healthcare New Bedford on July 15, 2002. It is based upon my education, training and experience, and on my review of various depositions including those of Nurses Candace Kalombratsos, Mary Stein, Amy Crompton, Marianne Faria and Katherine Fitzpatrick; Ronald T. Bogusky, M.D. and the plaintiff, Robert H. Gabler. It is also based upon my review of various items produced during discovery including photographs of Mr. Gabler's arm, his affidavit, and the parties' answers to interrogatories. My opinion is also based on Mr. Gabler's chart and records from the following providers: Robert A. Watson, MD; Robert A. Sirota, MD - Hypertension-Nephrology Assoc; Wes Arlein, MD - New Bedford Vascular Surgery; Moody Kwok, MD - Orthopedic Specialty Center; NovaCare (therapy); Robert Jubelirer and Abington Memorial Hospital; Matthew Goodman, MD and Medical Associates of Southampton; J.H. Pokorny, MD and Gambro Healthcare New Bedford.

## Introduction

By way of introduction, hemodialysis entails the pumping of blood from a patient into a dialysis machine, and then pumping the cleansed blood back into the patient, continuously over three to five hours. Dialysis cleanses the blood, work that would normally be carried out by the kidneys. An A-V (arteriovenous) fistula is one way to create easy access to veins for dialysis. Its creation, known as an anastomosis, is done surgically, by connecting an artery to a vein. After the creation of an A-V fistula, optimally, and with time, the increased blood flow generated from the artery-to-vein connection enlarges the vein, making it stronger and more suitable to withstand the trauma of hemodialysis, namely, repeated cannulation with a large gauge needle, and high blood flows. The forearm is a favored site for placement of an anastomosis because it allows for easy, repeated access to an unusually large, high-flow vein for needle cannulation. Nowhere on the fistula is the vein more pronounced, or the site more favorable for cannulation, than the area of the anastomosis.

## History

Mr. Robert Gabler is a patient with end stage renal disease who has been on hemodialysis since 1998, largely without incident until the circumstances surrounding this case. Before July

15, 2002 and through the present he has received his treatments at the Gambro Dialysis Center in Willow Grove, Pennsylvania.

In July 2002 his dialysis treatments were prescribed at three and a half hours, three times a week. Mr. Gabler has a Cimino A-V fistula, which is a connection between the cephalic vein and radial artery at the wrist. Photographs of his forearm at the time show an extremely well-developed vein running about ten inches along the surface of his forearm. The vein has enlarged segments from repeated needle puncture/cannulation for dialysis.

One of the activities he used to participate in before his injury was extensive traveling with his wife. Dr. Sirota, his nephrologist, noted from a visit of March 26, 2002, that Mr. Gabler had been dialyzed successfully in 15 different dialysis centers since his hemodialysis was initiated. The fistula has served him well, but at least by 2001, Dr. Sirota was becoming concerned about the repetitive cannulations at the exact same spots of the anastomosis. He noted on January 3, 2001 that "[t]he left forearm fistula was overdeveloped in two areas of persistent cannulation." October 24, 2001: "[t]he left arm AVF [arterio-venous fistula] was well developed if not over-developed. There were areas of some slight aneurysmal dilatation due to continuous needle sticking." Dr. Sirota noted from time to time the importance of rotating the cannulation sites and on this occasion he recommended that Mr. Gabler be seen by Dr. Jubelirer, who created the fistula. Dr. Jubelirer examined Mr. Gabler and noted, in a report of November 16, 2001, that the "fistula is functioning quite well. There are mild dilatations in the needle access of the graft...."On March 14, 2002 Dr. Jubelirer reported to Dr. Sirota that the venous dilatations were unchanged and that "we [should] continue to use his fistula without any restriction." From an office visit on March 26, 2002 Dr. Sirota noted that "the needle situation does not seem to be a problem. However, this fistula does have aneurysmal dilatation." As a precaution, he reiterated: "needles need to be spaced and the fistula should not be accessed in the same locations and the needles should be spread by 4 inches." At an exam on May 28, 2002 (approximately seven weeks before the incident in New Bedford) and reported in a June 5, 2002 note, Dr. Sirota reiterated his concern about cannulation spacing at the access site and indicated that "needles are now being spaced by four inches and cannulations are avoiding overused areas of his fistula." However, he added "[t]he fistula looks the same and seems adequate."

Anticipating a vacation in Massachusetts, Mr. Gabler requested that his usual dialysis unit, Gambro Willow Grove in Pennsylvania, arrange dialysis for him locally in Southeastern Massachusetts. Willow Grove found a spot for him at Gambro New Bedford and, before his first scheduled hemodialysis session scheduled for July 15, 2002, forwarded the necessary paperwork to New Bedford. That paper work included a prescription for treatment. He was to have received four treatments over the course of one week. Prior to his first treatment in New Bedford on July 15, 2002, he supplied them with his medical information. This information was used by Dr. Bogusky, medical director of the facility, to develop his standing orders that became Mr. Gabler's dialysis treatment prescription at Gambro, New Bedford. The prescription specified that vascular access was an A-V fistula in his left forearm. Other relevant information made known to the dialysis staff on that day included:

1. Mr. Gabler was scheduled for four treatments at their facility;
2. his treatments lasted three and a half hours;

3. his last treatment was on July 12, 2002;
4. following the July 12, 2002, treatment, his weight was 85.9 kg (189 lb.);
5. his estimated dry weight was 86.5 kg (190 lb).

Before his first treatment on July 15, 2002, Mr. Gabler informed the staff that his physician at Willow Grove wanted him to make sure the needles were not always placed into the same spot on his fistula, a rotatation guideline customarily and appropriately followed by Gambro. The Standing Orders form documented: access Type: AVF L. Forearm. Mr. Gabler's pre-dialysis blood pressure was 157/70; his weight was 89.7 (197), seven pounds above his dry weight, a moderate weight gain.

After Mr. Gabler was seated in the chair for his dialysis treatment, Candace Kalombratsos, RN, prepared his left arm for needle insertion. When she took up the first needle in her hand, Mr. Gabler turned his head away. Mr. Gabler stated that this was his usual practice, not wanting to watch the large needle penetrate his arm. He was surprised when he felt the top, venous needle penetrate above the forearm. The lower needle, the arterial needle, would have been used to draw out his blood into the dialysis machine. The upper-most needle would have been the venous return needle, through which his blood would be pumped from the dialysis machine back into his body. Despite an unambiguous access site at the left forearm, Nurse Kalombratsos went above the forearm, by several inches.

According to the computerized record, Mr. Gabler's dialysis started at 15:29. The treatment proceeded for approximately three hours and six minutes (according to Nurse Kalombratsos's note, three hours and fifteen minutes), during which time, the blood flow to the dialyzer was excellent, at 450. The rate of blood flow through the dialyzer is a key factor to meeting prescribed levels of dialysis delivery.

Nearing the end of his treatment, Mr. Gabler requested to move in his chair and Nurse Fitzpatrick assisted him in doing so. Soon after, the machine alarmed, indicating a drop in venous pressure. Simultaneoulsy, the patient began to experience a dull ache in his arm. Nurse Kalombratsos, who had been on the phone, came over and withdrew the needles. When his arm was unwrapped, Mr. Gabler saw marked swelling at the higher needle site. An infiltration had occurred. An infiltration is an unfortunate and occasional adverse occurrence of needle punctures when the dialysis needle penetrates the wall of a blood vessel causing blood to be released into the surrounding tissue. The significance of an infiltration is that, if severe enough, it can cause permanent damage to the access site, which would be a serious medical complication. The other danger is that, at least for the duration of the swelling, it would make reentry of the needle more complicated.

Nurse Kalombratsos suspended the dialysis treatment. She removed the needle from the infiltrated site and applied ice. There were approximately 25 minutes left in the treatment (fifteen minutes by Nurse Kalombratsos's calculation), but Mr. Gabler had already reached his target weight--in other words by therapeutic measures his dialysis was essentially complete. Without consulting a physician, Nurse Kalombratsos elected to recannulate, this time above the original cannulation and even farther away from the forearm. When Mr. Gabler turned his head away to avoid watching, he immediately felt a piercing shock of pain from his upper arm,

running down to his left hand, into his thumb, index finger, middle finger and the inside of his ring finger. When he looked at his arm, he saw that with recannulation she had stuck his arm a few inches from his axillary area, almost a full foot from the usual access sites. Nurse Kalombratsos pulled the needle but it would appear that the damage was done.

Three days later she came up with an explanation for the event, that the venous dilatation was comprised of not one but two aneurysms (preventing cannulation there) and that the patient had consented to needle entry into the upper arm. But by the time she testified in the case, first through her answers to interrogatories and then in her deposition, she came up with a third excuse that Mr. Gabler had insisted upon a second cannulation for the remainder of his treatment.

The computerized record of the July 15, 2002 treatment shows that the initial infiltration occurred at approximately 18:34, with twenty five minutes remaining to Mr. Gabler's treatment. It also reflects Nurse Fitzpatrick account of the incident, with a notation timed at 19:10 (15 minutes post-treatment): "infiltrated x1 with approximately twenty minutes remaining recannulated in area above and not previously used. Infiltrated again. Tx (treatment) ended with 10 minutes remaining. Ice applied to infiltrate. Instructed to apply ice pack at home." In her second entry, Ms. Fitzpatrick also hand-wrote the following: "Pt. with venous needle in upper aspect of ... arm. Treatment running well. Patient moved in chair to alleviate pain in back. Infiltrate noted at that time. Recannulated above site. New site infiltrated. Edema noted approximately 2 x 2 . Treatment stopped. Patient told to continue cold compresses during night and next day, then warm compresses if swelling continued. Cold packs given to patient to take home." Mr. Gabler's post-treatment weight was 86.4 kg, or 190 pounds. He had reached his dry weight.

On July 16, 2002, Mr. Gabler was self-referred to a vascular surgeon in New Bedford, Wes J. Arlein, MD. Dr. Arlein's assessment of the arm injury was that Mr. Gabler had gotten stuck in an artery or deep vein in his left upper arm, resulting in a median nerve injury. He found that Mr. Gabler was suffering from numbness in the thumb, 2nd and 3rd fingers, and of the 4th finger on the palmer aspect of the left hand.

## Discussion and Opinion

I believe, with a reasonable degree of certainty in the field of dialysis nursing, that Nurse Candace Kalombratsos deviated from the acceptable standard of care of the average, qualified dialysis nurse in her care and treatment of Mr. Gabler at Gambro Healthcare New Bedford on July 15, 2002. The reasons for my opinion follow.

Mr. Gabler was essentially an unknown patient to Nurse Kalombratsos who had never treated Mr. Gabler, a transient patient. Even though she had no experience with the individual vascular anatomy of his left arm, she chose not to use the well developed vein in Mr. Gabler's forearm and, contrary to physician orders, stuck the needle in the unchartered upper arm where the vessel is smaller, less developed, and the nerves are more precariously positioned.

While an anastomosis proximal to the wrist can create a theoretical access site more distally from the anastomosis, the safer and more reliable cannulation spot is the immediate area

of the joinder (where the artery-vein is most pronounced), in this case at the forearm where the cannulation was ordered. Further, it must have been apparent to Nurse Kalombratsos that the usual access site was the very site which she rejected because of a supposed aneurysm. According to her deposition testimony, the skin at this location exhibited recent, telltale needle scarring, which should have alerted her that this was the usual access.

With any question as to the integrity of the intended point of access it is incumbent upon the nurse to seek clarification by contacting the referring dialysis unit, or the physician in charge. With excellent trill and bruit, indicative of a patent access, and uniformly successful previous cannulations at the site of the anastomosis without incident, there was no acceptable reason to venture, without authorization, into the upper aspect of Mr. Gabler's arm.

If there were any question or contradiction as to where the needle should have been placed (initially), or if it should have re-placed, she should have consulted with the physician, either Paulette Dumas, MD who was the nephrologist covering the unit that day, or Dr. Bogusky who was the medical director. In the alternative, she should have phoned Mr. Gabler's usual dialysis providers in Pennsylvania. More likely than not, any of these options would have led her into the usual area on the fistula and not into the unfamiliar upper arm where the vein is smaller and more susceptible to injury.

The upper arm is also a poor choice for the reason that infiltration is always a possibility; therefore the site of cannulation should be in a location that has enough usable vein above it for safe recannulation in the event of infiltration event. The area below an infiltration becomes unusable because of the hematoma and mounting swelling. Nurse Kalombratsos's placement of the upper-most (venous) needle did not account for this well-known possibility.

After the infiltration, Ms. Kalombratsos knew or should have known that the most appropriate option was to discontinue the dialysis treatment and not risk further trauma to the vascular access arm. She knew or should have known that Mr. Gabler had already received more than three hours of effective dialysis with only seven pounds of fluid to remove (in fact, he reached his dry weight that day). He would be back in two days for another treatment, and had received effective dialysis only three days prior. These facts were noted in the chart that was available to Nurse Kalombratsos. If there were any doubt as to the appropriateness of recannulating--and there should have been--she should have consulted with the doctor who, more probably than not, would have ordered the treatment stopped for the day avoided serious injury.

At the time of the first infiltrate, two problems were coinciding: the venous needle, which had been placed in an inappropriate area in the upper aspect of Mr. Gabler's arm to begin with, had become dislodged and was now pumping the returning blood into the surrounding tissue. With minutes left in the treatment, and Mr. Gabler having already satisfactorily reached his dry target weight, treatment should have been halted for the day, or, at a minimum, Nurse Kalombratsos should have suspended treatment until the on-call physician examined the patient. Instead she recannulated improperly above the infiltration, forcing the needle completely through the vein and into the soft tissue hitting a nerve. She never was able to re-achieve flow from the arterial (lower) needle above 100, further indicating the poor placement of the needle.

It is my opinion, with a reasonable degree of certainty in the field of hemodialysis nursing that had Nurse Kalombratsos provided appropriate cannulation and provided appropriate nursing intervention for Mr. Gabler, he would have not suffered from a cannulation injury.

In addition to my review of the materials listed above, my opinion is also based upon my education, training and experience as a dialysis nurse.

I have not testified as an expert witness at a deposition or at trial in the preceding four years. I have not authored any publications in the preceding ten years. My fee for reviewing case records and documents is $ 150 per hour. My fee for testifying is $ 1,000 per half-day.

As to my qualifications, a copy of my current CV is attached.

Sincerely,

Susan R. Dickinson, RN

Susan R. Dickinson
257 King Street
Raynham, MA 02767
508-823-5819

**Education:**

Fitchburg State College
Bachelor of Science degree in Nursing, 1982

**Professional experience:**

**Feb. 2003-present**

Commonwealth Health Systems
907 Sumner St. Stoughton, MA 02072
1-781-341-8550
Responsibilities: Acute Level Hemodialysis R.N.
providing hospital level care to dialysis patients.

**Sept.2002-present**

City of Taunton
55 Williams St. Taunton, MA 02780
Responsibilities: School R.N. to an elementary school.

**Sept 1999-August 2002**

Taunton Kidney Center and Brockton Dialysis Center
1 Washington St. Taunton, MA 02780
375 Westgate Dr. Brockton, MA 02301
508-880-0889 and 508-586-2791
Responsibilities: Providing hemodialysis to chronic care
patients.

**August 1998-Dec. 1999**

Cranberry Hospital at the Goddard Center
909 Sumner St. Stoughton, MA 02072
Responsibilities: Providing Nursing care to rehab. patients
including respirators.

**Oct. 1996-August 1998**

Hospice care of Greater Taunton
502 Bedford St. Fall River, MA 02720
Responsibilities: caring for hospice and bridge patients
On a per diem basis.

**Aug. 1990-Sept. 1996**

Morton Hospital
88 Washington St. Taunton, MA 02780
Responsibilities: Providing Nursing care floating to all
Medical-Surgical floors.

**References:**

Available Upon Request.