Louise C. Riemer MS APRN BC CNN
Dialysis Access/Transplant Coordinator
The Transplant Center at Beth Israel Deaconess Medical Center
110 Francis Street LMOB 7
Boston, Massachusetts 02215
Phone: 617-632-9817  Fax 617-632-9804   Pager: 3-1276
lriemer@bidmc.harvard.edu

      My name is Louise C. Riemer. I am a registered Adult Nurse Practitioner licensed to practice in the Commonwealth of Massachusetts. My Adult Nurse Practitoner Certification is from the American Nurses Credentialing Center. I received my Bachelor of Science degree in Biological Anthropology from Harvard University. I obtained my diploma of nursing degree from Massachusetts General Hospital School of Nursing. I have a Post Graduate Certification in Neuromedical and Neurosurgical Nursing from The National Hospital for Nervous Diseases in London, England. I also have a Post Graduate Certification in Renal Nursing from Guys Hospital in London, England. My master's degree in Adult Primary Care is from Simmons College in Boston, Massachusetts. I have been a Certified Nephrology Nurse since 1991. I have worked extensively in the area of nephrology nursing since 1983. My nephrology nursing experience includes working as hemodialysis staff nurse in the in-patient setting with both acute and chronic patients as well as administering both hemodialysis and continuous renal replacement therapy in the Intensive Care Unit setting. I was the Clinical Leader in an acute hemodialysis unit responsible for patient care, staffing, policies, and water and machine monitoring. I have also managed a chronic freestanding dialysis clinic responsible for up to 30 staff and up to 120 patients both on hemodialysis and peritoneal dialysis. I am currently employed as a Dialysis Access Coordinator. In this role, I see patients with chronic kidney disease and do Renal Replacement Options teaching. I also see patients in the clinic with the surgeon for new dialysis access placement, follow patients for assessment of access maturation, and troubleshoot and manage problem access cases. I frequently do access rounds in both the in-patient and outpatient dialysis units affiliated with our Access Center. I am also a resource on dialysis and dialysis access for the hospital. I am familiar with the standard of care for the average qualified hemodialysis nurse practicing in Massachusetts in 2002.

      I have been asked to comment on whether Nurse Kalombratsos complied with the standard of care of the average qualified hemodialysis nurse on July 15, 2002 in caring for her patient, Mr. Robert Gabler, during his hemodialysis treatment at the Gambro New Bedford Unit. In forming my opinions, I have reviewed the following documents: Plaintiff's Offer of Proof; Plaintiff's discovery responses; Gambro Healthcare discovery responses; Nurse Candace Kalombratsos' discovery responses; Robert Gabler's deposition transcript; Nurse Candace Kalombratsos' deposition transcript; Mary Stein's deposition transcript; Gambro Healthcare records; Massachusetts Department of Public Health Regulations regarding Outpatient Dialysis; Marianne Faria's deposition transcript; Katherine Fitzpatrick's deposition transcript; Amy Crompton's deposition transcript; and, Dr. Ronald Bogusky's deposition transcript. My opinions are based on the aforementioned items and on my education, training, and experience.

Mr. Gabler was oriented to the New Bedford Dialysis Unit by the Nurse Manager, Marianne Faria. The requisite transient paperwork was reviewed including signing the Dialysis Consent Form. Of note, this consent form does briefly review the potential risks of the hemodialysis treatment including the risk of access complications.

Nurse Kalombratsos did her pre-treatment nursing assessment as indicated on the pre-treatment assessment section of the dialysis summary report from July 15, 2002. This assessment routinely involves listening to the patient's heart and lungs; checking for any signs of fluid overload such as peripheral edema, hypertension, or for fluid in the lungs; determining fluid removal by checking patient's weight gain from the prescribed estimated dry weight and reviewing the previous treatment's post weight and blood pressures; reviewing recent labs to make sure that there are no abnormal labs that would require any dialysis prescription changes or other medical intervention; reviewing patient's treatment and home medications; and, finally, also assessing the dialysis access for patency and for any signs of infection. Dialysis access assessment requires palpating the access for the appropriate thrill and auscultating for the bruit with a stethoscope.

In assessing Mr. Gabler's left arm fistula, Nurse Kalombratsos did note two large aneurysms on Mr. Gabler's forearm. Continuing to cannulate in the same area on a fistula can be a causative factor in aneurysm formation. An outflow venous stenosis along the more distal aspect of the outflow vein can also contribute to aneurysm formation. Dialysis nurses are taught to rotate cannulation sites on dialysis fistulae to prevent aneurysm formation. The reason for this is multifactorial. Rotating needle sites along the entire course of the fistula will ultimately prolong the life of the fistula. This is extremely important, as dialysis access sites are limited for most patients. Should an access fail, the patient would most likely need a dialysis catheter in order to receive hemodialysis until a more permanent access could be created. Dialysis catheters are associated with increased hospitalizations and a higher mortality given the increased susceptibility for infection. Continuing to needle in an aneurysm weakens the fistula wall, sometimes to the point where the vessel wall is so damaged that there is only a thin layer of skin on top of the aneurysm. The aneurysm could then easily rupture and potentially cause a serious bleed. Another problem is that the needle sites on aneurysms do not heal as well as the skin becomes so thin it is devascularized. A needle site could potentially start to ooze. A patient may not be aware of this slow ooze especially if sleeping. This non-healing area is also a nidus for infection. Clot can also develop in large aneurysms that may ultimately lead to fistula thrombosis. Therefore, Nurse Kalombratsos used good dialysis nursing judgment to avoid cannulating the fistula aneurysms.

Nurse Kalambratsos had a discussion with Mr. Gabler about needle placement, i.e. avoiding the two large aneurysms in the forearm. Mr. Gabler had no objection to her needle placement. It is always important to include the dialysis patient in the decision about needle placement. Most patients are very knowledgeable about their access. In this instance, Mr. Gabler was also a 'transient' patient at New Bedford and the staff were not familiar with him or his access. Nurse Kalombratsos demonstrated good communication skills and sensitivity towards her patient by including him in the decision making process of access cannulation. Mr. Gabler's left radio-cephalic fistula was so well developed, he

had a prominent outflow vein up that coursed up into his axilla. Nurse Kalombratsos cannulated the arterial needle (blood to the machine) below the antecubital fossa avoiding the aneurysm and cannulated the venous needle (dialyzed blood returning to the body) above the antecubital fossa in this well-developed outflow vein. Dialysis was initiated without complication. In reviewing the patient statistics from the post treatment sheet, the blood flow, venous pressures, and arterial pressures were all within normal range. If there were to be a problem with the arterial needle, one would expect to see problems with the blood flow and a very negative arterial pressure. The blood flow was 450 and the max arterial negative pressure was 220. These readings were appropriate and not indicative of a problem. If there were a problem with the venous needle, one would expect an elevated venous pressure. The venous pressure was stable in the 180s until 18:30. The half hourly checks also indicated that Mr. Gabler was not having any problems with the treatment. His vital signs were very stable and the caregiver checks stated that the patient was stable.

At 18:30, Mr. Gabler was repositioned in his chair as he was having some back discomfort. At this time, per report, the machine alarmed and Mr. Gabler began to complain of pain in his arm. The venous pressure on the machine did go up to 192 and there was a blood pressure elevation to 202/74 possibly indicative of a pain response to the increased venous pressure and subsequent infiltration. Nurse Kalombratsos responded to the machine high venous pressure alarm and patient complaint of pain by turning off the blood pump and assessing the situation. She did note an infiltration at the venous site of needle. Nurse Kalombratsos subsequently disconnected the patient from the machine and recirculated the blood. This action gives the dialysis nurse about 30 minutes to assess any patient complications otherwise the blood would clot if it were to stay stagnant in the dialysis lines and the patient would therefore lose this blood which is equivalent to about one unit. The infiltrated venous needle was pulled and pressure held to achieve adequate hemostasis. Ice was applied to decrease the edema and pain.

Nurse Kalombratsos subsequently had a discussion with Mr. Gabler about terminating the dialysis treatment pre-maturely given the infiltration and fact that there were only about 20 minutes left of his prescribed treatment. Mr. Gabler wanted to try and complete his full treatment. Of note, Mr. Gabler's dialysis adequacy (Kt/V) from the previous month was only 1.26. The standard for dialysis adequacy is 1.3 or greater. Continually cutting treatment times and having poor blood flows can contribute to poor dialysis adequacy. With poor dialysis adequacy, patients can develop uremic symptoms, hyperkalemia, and/or hyperphosphatemia. This may have also influenced Nurse Kalombratsos' decision to try and re-initiate the dialysis treatment. Nurse Kalombratsos placed the second needle above the venous infiltrate which is the standard of care as one does not want the returning blood to further exacerbate the previous venous infiltrate. The second venous needle was cannulated without difficulty. Nurse Kalombratsos re-initiated the dialysis treatment very cautiously with a pump speed of 100. She was not comfortable with the pressures or the way the arm looked. She therefore used appropriate nursing judgment and terminated the treatment a few minutes early.

Mr. Gabler was discharged from the dialysis unit that evening with the appropriate instructions - to apply cold compresses for 20 minutes on and 20 minutes off followed by moist warm soaks the following day.

In my professional opinion, to a reasonable degree of medical certainty, the care and treatment rendered to Mr. Robert Gabler by Nurse Kalombratsos on July 15, 2002 complied with the standard of care for the average qualified hemodialysis nurse practicing in Massachusetts in 2002. The bases and reasons for my opinion include the following: Nurse Kalombratsos' physical assessment skills documented on the pre-treatment summary report of the dialysis summary report dated July 15, 2002; completion of the pre-dialysis machine safety checks documented on the dialysis summary report dated July 12, 2002; Nurse Kalombratsos' knowledge of dialysis access and cannulation based on her nursing judgment to avoid cannulating fistula aneurysms; Nurse Kalombratsos' good communication skills as she was able include Mr. Gabler in decisions regarding his care; Nurse Kalombratos' ability to respond appropriately and quickly in an urgent dialysis situation as demonstrated when Mr. Gabler's venous needle infiltrated; and, finally, Nurse Kalombratsos demonstrated good clinical decision making when she proceeded slowly and cautiously with the second venous needle by starting the dialysis flow rate at a very low pump speed and ultimately deciding to terminate the dialysis treatment given Mr. Gabler's recent infiltrate. Nurse Kalombratsos' actions show competency in hemodialysis nursing and exhibit compliance with the standard of care for the average qualified hemodialysis nurse. Nurse Kalombratsos' care for Mr. Gabler on July 15, 2002 was in also compliance with the Gambro Healthcare policies.

In my opinion, I do not feel that Nurse Kalombratsos or the other caregivers working at the Gambro New Bedford Clinic on July 15, 2002 did anything to cause this injury or were negligent in the care of this patient. Hemodialysis is not a benign procedure. There are many risks taken when one is placed on the dialysis machine. The policies of Gambro, the staff training, and good nursing care are all developed to protect the patient, minimize complications and to provide optimal outcomes.

I will be compensated at a rate of $300.00 an hour for case review and deposition and trial testimony. Within the preceding four years, I have not testified as an expert at trial or by deposition. In 1999, I authored an article entitled "Nursing in the chronic dialysis unit" which was published in <u>Nursing Spectrum</u>. Within the preceding ten years, I have not authored, co-authored, and/or contributed to any other publications. During the course of my testimony, I may refer to the applicable medical literature and medical records, as well as rely upon diagrams and other visual aids to refer to portions of the anatomy in support of my opinions.

Louise C. Riemer MS APRN BC CNN

Dated: November 17, 2006